IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 10, 2026 Session

**BOBBY JOE PATRICK v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Grundy County**
No. 5445    Bradley Sherman, Judge

_____

**No. M2025-01058-CCA-R3-PC**

_____

A Grundy County jury convicted the Petitioner, Bobby Joe Patrick, of two counts of rape of a child, and the trial court ordered an effective sentence of sixty-seven years in the Tennessee Department of Correction. The Petitioner appealed, and this court affirmed the trial court's judgments. *State v. Patrick,* M2019-02026-CCA-R3-CD, 2021 WL 2102914, at *1 (Tenn. Crim. App. May 25, 2021), *perm. app. denied.* (Tenn. Feb. 10, 2022). The Petitioner filed a petition for post-conviction relief, claiming ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. On appeal, the Petitioner maintains that he is entitled to post-conviction relief due to the ineffective assistance of counsel and cumulative error. Following our review of the record, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

W. Alan Rose and Corey A. Spearman, Tullahoma, Tennessee, for the appellant, Bobby Joe Patrick.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Courtney Lynch, District Attorney General; and Taffy Wilson and Thomas McEntyre, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

At trial, a Grundy County jury convicted the Petitioner of two counts of rape of a child, and the trial court ordered an effective sixty-seven-year sentence. This court affirmed the convictions and sentences on appeal. *Patrick,* 2021 WL 2102914, at *1. The

evidence at trial showed that the victim disclosed sexual abuse following a school presentation on child sexual and physical abuse. The Petitioner lived with the victim and her mother at the time, and the victim's mother worked nights. During a forensic interview, the victim reported that while her mother was at work at night, the Defendant would get in bed with the victim and touch her.

The Petitioner timely filed a post-conviction petition alleging that he had received the ineffective assistance of counsel at trial based upon his attorney's ("Counsel") failure to object to Rule 404(b) evidence admitted at trial. The Petitioner filed two amendments to his petition, but his ineffective assistance claim remained the same – Counsel failed to object to 404(b) evidence admitted at trial. The post-conviction court held a hearing where it admitted a video recording of Counsel's January 3, 2025 sworn deposition.[1]

Counsel explained that, initially, the trial court appointed John Stewart to represent the Petitioner; however, Mr. Stewart withdrew from the case due to a change in employment. The trial court then appointed the Public Defender's Office, and he was assigned the case. Counsel represented the Petitioner up to and through the trial. He was occasionally assisted by his superior, then-District Public Defender, Jeff Harmon. At the time his office was appointed, certain pretrial motions had been filed, and the discovery process was underway. Counsel obtained the Petitioner's file from prior counsel.

Counsel sought to protect the Petitioner's legal interests by working for a favorable plea, because in his experience child rape charges were challenging cases that were "tough to try", and "high stakes affairs." The State and Counsel reached a tentative resolution, but the proposed plea was rejected by the trial judge.

Counsel recognized the potentially detrimental effect of prior bad act evidence and sought to prevent or mitigate those negative effects through motions in limine addressing Rule 404(b) evidence and pretrial hearings. These included a hearing on the admissibility of the Child Advocacy Center's forensic interview with the minor victim. Counsel filed motions, had numerous discussions with the Court and with the prosecutor, and cited case law to address certain issues and to preserve other issues in anticipation of trial and an appeal.

Counsel interviewed witnesses and worked with the Petitioner and his mother, Connie Hampton, to prepare for trial. While Counsel believed the Petitioner had "some cognitive impairment," the Petitioner had been evaluated and deemed competent to stand

---

[1] According to the post-conviction court's order, Counsel developed "serious health problems" during the post-conviction proceedings that prevented him from attending the hearing. The recording was entered without objection.

trial, to assist counsel in the preparation of his defense, and to participate in a meaningful way. Counsel recalled that, while the Petitioner sometimes had trouble communicating effectively, the Petitioner was able to understand the discussions he had with Counsel and was likewise "able to comprehend the advice."

Counsel involved the Petitioner's mother, Connie Hampton, in their many discussions and enlisted her help in ensuring the Petitioner fully understood the discussions. When speaking with the Petitioner, Counsel took things slowly and addressed his advice directly to the Petitioner in a measured, purposeful way. He made sure to make eye contact with the Petitioner to gauge his focus and understanding.

Counsel testified that the Petitioner's family had transportation challenges throughout his representation, so Counsel often went to the Petitioner's family home to meet with him. This gave Counsel the opportunity to get to know the Petitioner and his extended family.

At trial, Counsel was cognizant of the sensitive nature of child rape cases and the need for a skillful and gentle approach with the minor victim and the jury. Counsel chose to refrain from incessantly objecting to matters that did not "prove anything about child rape" to avoid emphasizing negative evidence with the jury.

Just before trial, Counsel learned that the victim had allegedly made statements to her half-sister, H.P.,[2] amounting to a recantation. Counsel investigated and explored this alleged recantation. Counsel acknowledged that the victim's alleged recantation was not recorded, but rather H.P. was recorded telling the Public Defender's investigator that the victim had recanted. Counsel was familiar with the victim's half-sister, and based upon the timing of her recantation claim, he believed H.P.'s statements to the investigator were coached. He explained that the issue of recantation had not come up in any of the numerous prior meetings with the Petitioner's family. Additionally, the family removed H.P. to Ohio before the trial, apparently to avoid having her testify and cause a rift in the family.

Counsel provided further insight into his choice to avoid repeated objections at trial. He explained that, as a general practice he did not "repeatedly object" to evidence already deemed admissible by the trial court. He believed doing so would emphasize and draw the jury's attention to negative evidence. Counsel said that he was mindful not to come "across as an ogre to the jury," particularly with respect to a minor victim. Counsel also explained that his decision to limit objections was a tactical decision. Some of the prejudicial or negative information admitted at trial, such as allegations of abuse or threats, allowed

---

[2] It is the policy of this court to refer to minors by their initials.

Counsel to argue that the victim had a retaliatory motive to fabricate the rape allegations against the Petitioner.

Counsel consulted with then-Public Defender, Jeff Harmon, on issues in the case and Mr. Harmon assisted Counsel with work on the Petitioner's defense.

At the post-conviction hearing, Jeff Harmon testified that he was the Public Defender at the time of the Petitioner's trial and that Counsel, an Assistant Public Defender, represented the Petitioner at trial and through the direct appeal. Mr. Harmon reviewed the file maintained by the Public Defender's Office and did not notice anything "out of the ordinary" with respect to Counsel's representation of the Petitioner.

Mr. Harmon stated that Counsel sat as "first chair" and asked him to assist at trial as "second chair." Mr. Harmon identified a motion for individual sequestered voir dire. He explained that he generally filed such a motion in cases involving child sex abuse. Mr. Harmon confirmed that his office also filed a 404(b) challenge to the admissibility of the recording of the Children's Advocacy Center forensic interview of the victim. This motion was handled by Counsel, who notified Mr. Harmon of the outcome of the motion – the trial court had ruled the recording was admissible along with some other threats the Petitioner made. Mr. Harmon recalled the defense filing and arguing various motions. He identified several motions in limine seeking to preclude certain evidence. The trial court, however, ruled that the evidence was admissible.

Mr. Harmon explained that, as a matter of strategy, the defense team did not object at trial to 404(b) material. He believed there was a possibility of "making things worse" by objecting after the trial court had ruled the evidence admissible. He explained that in child sex abuse cases, juries often want to know why a child would make the allegations if they were not true. In this case, some of the evidence the State sought to introduce was that the Petitioner had whipped the child, made threats, and pulled a gun on the victim's mother. This provided the defense with an argument that the victim made the false allegations as retribution for these acts.

The Petitioner testified that he could not read or write, so when the charges were reviewed with him, he did not "really ever understand" the charges he was facing. He recalled that he met with Counsel two or three times and that Counsel never explained the State's evidence against him. The Petitioner could not recall whether he ever told Counsel that he could not read or write.

The Petitioner testified that Counsel was too ill during his representation to "truly fight[]" for the Petitioner. The Petitioner maintained his innocence and affirmed his desire

for the judgments to be vacated. He said that he disciplined his children by "whipping" them with an open hand.

On cross-examination, the Petitioner agreed that he was present in the courtroom during all the hearings related to his case. He also confirmed that he testified at trial that he did not threaten the victim and did not beat the victim. The Petitioner agreed that Counsel met with the Petitioner's mother "multiple times" about the case and that his mother would speak with the Petitioner about those conversations. The Petitioner agreed that "if [Counsel] felt like [his] mother could communicate with [the Petitioner] better, that is what [Counsel] did." Upon further questioning by the post-conviction court, the Petitioner stated that he lived with his mother before the trial. He could not explain why Counsel met with the Petitioner's mother or where he was at the time of those meetings.

Connie Hampton, the Petitioner's mother, testified that the Petitioner was a concerned and involved father. She was surprised by the allegations the victim made against the Petitioner. Ms. Hampton confirmed that the Petitioner lived with her and testified that she never witnessed any physical or sexual abuse of the children.

Ms. Hampton confirmed that the Petitioner could not read or write. The Petitioner appeared to her to understand what he was charged with, he just could not understand why he was charged with those offenses. Ms. Hampton stated that the Petitioner appeared confused about his case and "didn't know that much about it." Ms. Hampton recalled that Counsel did not meet with the Petitioner much due to Counsel's health problems. Ms. Hampton said that there "wasn't too much communication," but noted that Counsel came to her house and met with her and the Petitioner "a couple of times." She also recalled speaking with Counsel over the phone about the Petitioner's case. Although there was never a spoken agreement, it just happened that Counsel communicated with Ms. Hampton, and Ms. Hampton conveyed the information to the Petitioner.

Ms. Hampton testified that she had obtained her GED but did not attend college. When asked if she felt she could explain the case to the Petitioner, she responded that there "wasn't all that much" to tell the Petitioner. She recalled that she did not get any paperwork until "[c]lose to the end." The documents she received were complicated and she had to review them carefully. Ms. Hampton explained that the Petitioner was "a little concerned" because it seemed that Counsel did not follow up on some issues or concerns.

Ms. Hampton recalled that Counsel conveyed several offers to the Petitioner. The Petitioner finally agreed to one offer to plead guilty on the gun charge only. Counsel and the Petitioner shook hands, and then Counsel left. Later, Counsel called Ms. Hampton and told her that the trial court would not accept any offer that did not result in the Petitioner being placed on the sex offender registry.

5

On cross-examination, Ms. Hampton testified that she "frequently handled things for [the Petitioner]" because he could not read or write. She agreed that it was possible that Counsel allowed Ms. Hampton to explain the legal issues in a way the Petitioner could understand. Upon further questioning by the post-conviction court, Ms. Hampton estimated that Counsel met with them six or seven times.

Susan Stephens was a close friend of the victim's mother. During the trial, the victim's mother and the victim lived with her. Ms. Stephens stated that the victim did not speak with her about the trial but that the victim recanted some of her allegations to Ms. Stephens's brother-in-law.

Devin Coppinger, another close friend of the victim's mother, testified that the victim disclosed that she had lied or exaggerated the truth when she testified. The victim made this disclosure while she was crying hysterically and visibly upset. The victim told Ms. Coppinger that she was upset because she had "made a mistake" and sought advice about the "situation." Ms. Coppinger never told anyone about this incident. She explained that she did not because the victim asked her not to tell anyone.

H.P., the victim's half-sister, testified that the victim was truthful sometimes, but not always. To H.P., it appeared that the victim was less concerned about lying if it benefited her but that she was less comfortable with lying if it did not benefit her.

The victim testified that she was truthful in her interview at the Child Advocacy Center. She denied that anyone told her what she should say during the interview. The victim agreed that she was scared during the interview. The victim further agreed that she stated some things differently in the Child Advocacy Center interview than she did in her testimony at trial. She explained that it was because she was seven years old "when it started." She again denied that anyone – police, family, attorneys – pressured her into saying something that was not true.

When asked if there was anything about her trial testimony that she would change, she answered in the negative. She further denied having told anyone, post-trial, that her trial testimony was not true. She denied recanting her testimony to Ms. Coppinger, stating that she had never spoken with Ms. Coppinger about her trial testimony. On cross-examination, the victim testified that she never told Willy Stephens that she was untruthful during her trial testimony. The victim did not know why Ms. Stephens would testify that the victim had recanted her testimony to her brother-in-law, Willy Stephens. As to why Ms. Coppinger claimed the victim was recanting, the victim guessed that it was likely because she shared a child with the Petitioner. She reiterated that she never told her sister that her testimony was false.

In a written order, the post-conviction court denied relief.

## II. Analysis

The Petitioner asserts that he received the ineffective assistance of counsel at trial. He claims that Counsel failed to communicate with the Petitioner, failed to object to prejudicial character evidence, and was significantly ill, undermining his ability to adequately represent the Petitioner. Further, he argues that the cumulative effect of all these errors warrants relief.

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be

7

said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must

be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Ineffective Assistance of Counsel

The Petitioner asserts that Counsel failed to communicate effectively, failed to object to improper Rule 404(b) evidence and that Counsel's illness "prevented effective representation." The State notes that, of these three issues, the Petitioner only raised the claim related to 404(b) evidence in his petition and at the hearing on the matter. Consequently, the post-conviction court did not address any other issues.

As a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court." *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996); *see* T.C.A. § 40-30-106(g) (2018) (providing that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," with limited exceptions). We agree with the State that the only ineffective assistance of counsel issue presented in the petition is whether the Petitioner's trial counsel was ineffective for failing to object to the admission of improper 404(b) evidence. Therefore, the Petitioner's other issues on appeal are waived because they were not raised in the petition for relief or ruled upon by the post-conviction court.

After the hearing, the post-conviction court issued an order denying relief. The post-conviction court made the following findings as to credibility:

> Assistant Public Defender, [Counsel] and then-Public Defender, Jeff Harmon, are both capable, competent, experienced attorneys with years of criminal defense practice under their respective belts. They have both represented many criminally accused and justice-involved people, participated in numerous hearings and trials and generally enjoyed positive reputations in the legal community. As such, this Court finds them both to be credible witnesses. The Court credits the testimony of both [Counsel] and Harmon.

With respect to the admission of 404(b) evidence, the post-conviction court made the following findings:

> This Court cannot find from the proof that [Counsel] was deficient in his representation of the Petitioner. On the contrary, he clearly worked on the case, met with his client and his client's close family, prepared for trial, and

9

made strategic decisions for articulable reasons based on his knowledge of Grundy County and, more particularly, Grundy County juries.

The evidence does not preponderate against the trial court's findings. Counsel sought to preclude evidence of potential threats or acts of violence by the Petitioner, but the trial court ruled the evidence admissible. As a matter of strategy, because there was a minor victim involved in the case, Counsel was very aware of the perceptions of the jury. The trial court had ruled the statements admissible; therefore, he elected not to emphasize or draw more attention to the Petitioner's acts. Furthermore, the defense sought to use the evidence to provide the jury with a reason why the victim would have fabricated the allegations. They posited that the victim made up the sex abuse allegations as retaliation for the Defendant's threats and physical abuse. The evidence supports that Counsel's choice was an informed one and based upon adequate preparation.

Accordingly, the Petitioner failed to establish deficient performance or prejudice by clear and convincing evidence. He is not entitled to relief as to his issue.

## B. Cumulative Error

The Petitioner contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the Petitioner's issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____s/ *Robert W. Wedemeyer*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE